UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

M.B., *and* J.B., *on behalf of their child*, A.B.,

                                   Plaintiffs,

        v.

KATONAH-LEWISBORO UNION FREE
SCHOOL DISTRICT,

                                   Defendant.

No. 24-CV-1745 (KMK)

OPINION & ORDER

Appearances:

M.B.
J.B.
*Pro Se*

Cassidy E. Allison, Esq.
Daniel Petigrow, Esq.
Steven Leon Banks, Esq.
Thomas, Drohan, Waxman, Petigrow & Mayle, LLP
Hopewell Junction, NY
*Counsel for Defendant*

KENNETH M. KARAS, United States District Judge:

        Plaintiffs, M.B. and J.B. (together, "Plaintiffs" or the "Parents"), in their capacity as the

parents of their minor child, A.B., bring this Action against the Katonah-Lewisboro Union Free

School District, ("Defendant" or the "District"), under the Individuals with Disabilities

Education Act ("IDEA"), 20 U.S.C. § 1400 et seq.  (*See* Compl. (Dkt. No. 1).)  This dispute

arises out of the decisions of an Impartial Hearing Officer ("IHO") and a State Review Officer

("SRO"), who adjudicated the Parents' administrative claims for relief based upon the District's

alleged failure to provide A.B. a free and appropriate public education ("FAPE") for the 2019–

2020, 2020–2021, 2021–2022 and 2022–2023 school years.  (*See* Compl. ¶ 10 (Dkt. No. 1).)[1]

Before the Court are the District's Motion for Summary Judgment ("Defendant's Motion") and

the Plaintiffs' Motion for Summary Judgment ("Plaintiffs' Motion") (collectively, the

"Motions").  (*See* Not. of Mot. ("Def. Not.") (Dkt. No. 28); Pls. Mem. of Law in Supp. Mot.

("Pls. Mem.") (Dkt. No. 31).)  For the following reasons, the Motions are granted in part and

denied in part.

## I.  Background

### A.  Factual Background

The following facts are taken from the Parties' statements pursuant to Local Civil Rule

56.1, (*see* Def. Rule 56.1 Statement ("Def. 56.1") (Dkt. No. 30)), Pls.' Rule 56.1 Statement ("Pls.

56.1") (Dkt. No. 32); Def. Rule 56.1 Counterstatement ("Def. Counter 56.1") (Dkt. No. 35); Pls.'

Rule 56.1 Counterstatement ("Pls. Counter 56.1")), as well as the administrative record.

#### 1.  A.B.'s Educational and Medical History

##### a.  2016–2017 and 2017–2018 School Years (Kindergarten and First Grade)

In 2016, A.B. entered the Katonah-Lewisboro Union Free School District as a

kindergartener.  (*See* Pls. 56.1 ¶ 1; Def. Counter 56.1 ¶ 1.)  Plaintiff M.B. testified that in the fall

of A.B.'s kindergarten year, Plaintiffs were told that A.B. was "slower [at] picking up her letters

and rhyming," but A.B.'s teacher suggested that these issues could be a product of the fact that

A.B. was younger than most students in her kindergarten class.  (*See* Decl. of Cassidy Allison

("Allison Decl.") Ex. 9 at 674 (Dkt. No. 26-9).)  M.B. testified that in response to A.B.'s

---

[1] Unless otherwise noted, the Court cites to the ECF-stamped page number in the upper righthand corner of each page.

difficulties, the District assigned A.B. to a Response to Intervention ("RTI") program.[2]  (*See id.* at 675–640.)

By the first grade, M.B. testified that A.B.'s teacher informed Plaintiffs that she had concerns about A.B.'s writing speed, that she was "flipping a lot of letters," and that she seemed "to have a lot of trouble getting pen to paper."  (*See id.* at 677–678.)  M.B. stated that although A.B. was kept on the RTI, she was not making progress and beginning to display behavioral issues related to completing assignments and doing reading.  (*See id.* at 679.)  As a result of these challenges, A.B.'s RTI support was escalated from Tier I to Tier II.  (*See id.*)  According to M.B., she then began making calls to the special education department.  (*See id.* at 680–683.)  M.B. testified that at her request, A.B. was eventually evaluated for special education services.  (*See id.* at 684; Pls. 56.1 ¶¶ 14–18; Def. Counter 56.1 ¶¶ 14–18.)

> b. The 2018-2019 School Year (Second Grade)

In June 2018, A.B. was classified as a student with a learning disability by the school's committee on special education ("CSE") convened by the District.  (*See* Def. 56.1 ¶ 3; Pls. Counter 56.1 ¶ 3; Pls. 56.1 ¶ 17; Def. Counter 56.1 ¶ 17.)  Over the course of the 2018–2019 school year, the CSE recommended four different IEPs.  The first IEP, recommended in June 2018, provided for "special education services consisting of three 45-minute and two 30-minute sessions of group (5:1) Resource Room services per week and two 30-minute sessions of direct consultant teacher services per week."  (Def. 56.1 ¶ 6; Pls. Counter 56.1 ¶ 6.)  The June IEP set

---

[2] The District's website defines RTI as "the practice of providing high-quality instruction/intervention matched to student needs and using learning rate over time and level of performance to make important educational decisions about an individual student."  *See Welcome to Student Support Services*, Katonah-Lewisboro Sch. Dist., https://www.klschools.org/page/student-support-services [https://perma.cc/7WTD-PWDH] (last visited July 30, 2025).

two reading goals and one writing goal.  (*See* Pls. 56.1 ¶¶ 30, 31; Def. Counter 56.1 ¶¶ 30, 31.)
The reading goals were: "[w]hen presented with 10 spoken single-syllable words, [A.B.] will
segment the words into their complete sequence of individual sounds;" and [w]hen presented
with 10 words from reading narratives or specific information text from [A.B.]'s content area
subjects on the [s]econd[-]grade level, [A.B.] will correctly decode the words."  (*See* Pls. 56.1 ¶
30; Def. Counter 56.1 ¶ 30.)  As for writing goals, the IEP set an annual goal that: "[A.B.] will
write a narrative using [two] details to describe actions, thoughts and feelings about an event,
including temporal words (e.g., first, next, then) and a closing statement."  (*See* Allison Decl.,
Ex. 3 at 138 (Dkt. No. 26-3).)  The criteria to determine whether these annual goals had been
achieved was "75% success over two weeks."  (*See id*.)

> Plaintiffs expressed a range of concerns about the June 2018 IEP, including:
>
> [the] (i) lack of clarity on the instructional program to be used in Resource Room
> to teach A.B. to read . . . (ii) lack of assistive technology . . . (iii) sufficiency of
> timing associated with instructional program to be used in Resource Room based
> on verbally represented program requiring either 60-90 minutes of instruction 2-5
> times a week in a 1:1 [setting], or 45-90 mins[ d]aily in a small group setting of no
> more than 6 students . . . (iv) lack of clarity on present levels of performance on
> baseline reading skills . . . (v) baseline expectations for students within the same
> grade (so as to better understand the disparity in skills and goals needed to close
> the widening skill gap) . . . (vi) absence of annual goals for each of the requisite
> reading skills

(Pls. 56.1 ¶ 35; Defs. Counter 56.1 ¶ 35.)  Despite these concerns, A.B. was enrolled in a school
in the District for the 2018–2019 school year.  (*See* Def. 56.1 ¶ 7; Pls. Counter 56.1 ¶ 7.)

The Parents requested an Independent Educational Evaluation ("IEE").  (*See* Pls. 56.1
¶ 20; Def. Counter 56.1 ¶ 20.)  The IEE was conducted by Dr. Jean Deitrich on July 26, 2018.
(*See* Pls. 56.1 ¶ 36; Def. Counter 56.1 ¶ 36.)  Dr. Deitrich concluded that A.B. presented as
suffering from dyslexia, (*see* Allison Decl., Ex. 3 at 197), and recommended that A.B. be given
instruction in curriculum "such as [the] Orton-Gillingham" curriculum, "an educational program

utilizing a multi-sensory, intensive and sequential phonetically based curriculum," and that A.B. be taught "the basics of word formation in a sequential and predictable fashion utilizing the cumulative acquisition of symbolic relationships." (*See* Pls. 56.1 ¶¶ 42–45; Def. Counter Pls. 56.1 ¶¶ 42–45.)

On September 20, 2018, the CSE "convened [again] to review the IEP, speak to identified parent concerns surrounding the IEP, review results of the occupational therapy evaluation and results of the psychoeducational evaluation (IEE)." (*See* Pls. 56.1 ¶ 54; Def. Counter 56.1 ¶ 54; Allison Decl., Ex. 3 at 200.) Based on the IEE, the CSE made changes to the accommodations provided to A.B., including adding preferential seating, cueing, an alphabet reference for A.B.'s desk, and a consultant teacher to the reference room. (*See* Pls. 56.1 ¶ 55, 58; Def. Counter 56.1 ¶ 55, 58.) A.B.'s reading skills annual goals were updated to add additional specificity, but the writing goals remained unchanged. (*See* Allison Decl., Ex. 4 at 8 (Dkt. No. 26-4).)

On November 19, 2018, the CSE convened once more to update A.B.'s IEP, to include updated reading goals and writing goals that were more focused on the mechanics of writing, rather than A.B.'s ability to develop coherent narratives. (*See* Pls. 56.1 ¶¶ 63–67; Def. Counter 56.1 ¶¶ 63–67; Allison Decl., Ex. 4 at 22.) The IEP was amended once more on February 21, 2019, to add a "slant board" on which A.B. could write. (*See* Pls. 56.1 ¶¶ 76–77; Def. Counter 56.1 ¶¶ 76–77.)

A.B. also underwent a number of tests during the 2018–2019 school year. On November 28, 2018, the Parents took A.B. to an Initial Educational Screening at the Windward School ("Windward"). (*See* Pls. 56.1 ¶ 68; Def. Counter 56.1 ¶ 68.) Windward's Initial Educational Screening showed that A.B. tested at a first grade reading level on the Rosner Test of Auditory

Analysis Skills, that she was in the second percentile on the Gray Oral Reading Test, the 88th percentile on the Peabody Picture Vocabulary Test, the 66th percentile on the Boston Naming test, and that she was in the 86th percentile on the Weschler Intelligence Scale. (*See* Allison Decl., Ex. 6 at 84–85 (Dkt. No. 26-6).)

The District also administered a number of tests at the end of the 2018–2019 school year. On the Word Identification and Spelling Test ("WIST"), A.B. ranked in the 25th percentile for "Fundamental Literacy Ability," 61st percentile for "Sound-Symbol Knowledge," 30th percentile for spelling, 23rd percentile for "Word Identification."[3] (*See* Pls. 56.1 ¶ 82; Def. Counter 56.1 ¶ 82.) On the i-Ready test, A.B.'s test scores on the Reading section were evaluated as "Approaching Grade 2" or "At Grade 2." (*See* Allison Decl., Ex. 5 at 86 (Dkt. No. 26-5).)

The Parents also received A.B.'s second grade report card, which indicated that A.B. received grades of "Developing" in four of the nineteen categories in English Language Arts, and higher grades—"Secure" and "Approaching Secure"—in the remaining categories. (*See* Allison Decl., Ex. 6 at 70.)[4] The Parents also received an end of year report regarding the progress made by A.B. under the IEP. (*See* Allison Decl., Ex. 2 at 117–119 (Dkt. No. 26-2).) As to the first reading goal—that A.B. be able to read accurately aloud at 48 words per minute—the final assessment indicated that A.B. "maintained an average rate of 44 [words per minute]." (*See id.* at 118.) As to the second reading goal—that A.B. be able to decode a list of fifty decodable

---

[3] As discussed further below, the Parties dispute whether the WIST test was performed incorrectly and therefore inflated A.B.'s scores. (*See* Pls. 56.1 ¶ 82; Def. Counter 56.1 ¶ 82.)

[4] The Katonah-Lewisboro Progress Report measured student academic performance on a six-step scale: "Secure," "Approaching Secure," "Developing," "Beginning," "Not Expected," or "Not Demonstrated." (*See* Allison Decl., Ex. 6 at 70.)

words at a 75% success rate—the final assessment indicated that A.B. decoded 44 out of 48 "CVC" words, 6 out of 10 "CV" words, 10 out of 10 "welded sound" words, and 9 out of 11 "baseword with suffixes." (*See id*.) The report also indicated that A.B. achieved the third reading goal—that she recognized 65 out of 93 sight words expected at the end of the first grade. (*See id*.) As to the first writing goal—that A.B. be able to encode a list of decodable words at a 75% success rate—the report indicated that she was able to encode 19 out of 30 "CVC" words, 8 "welded sounds" words, 1 out of 3 "bonus letter" words, 2 out of 5 "VCE" words, 4 out of 4 multi-syllable words, 2 out of 5 "vowel team" words, and 5 out of 9 "open syllable" words. (*See id*.) The Parties dispute whether these results indicate that A.B. failed to meet the IEP's annual goals as to reading and writing. (*See* Pls. 56.1 ¶¶ 94–98; Def. Counter 56.1 ¶¶ 94–98.)

c.  The 2019-2020 School Year (Third Grade)

On May 21, 2019, the CSE provided A.B. with an IEP consisting of: one 40-minute session of group (5:1) Resource Room services per day, as well as clarification of directions, visual and auditory supports, additional time for assignments, use of graphic organizers for writing assignments, support breaking directions and tasks into smaller components and checking for understanding, an alphabet reference for the student's desk, and preferential seating to place A.B. closer to the teacher and reduce ambient noise. (*See* Allison Decl., Ex. 3 at 62.) Notably, A.B.'s direct consultant teacher services were removed. (*See id*.) On June 17, 2019, Plaintiffs notified Defendant that they would be enrolling A.B. at Windward—and that they intended to seek reimbursement of tuition and all related expenses at Windward—because they found the IEP did not provide appropriate education to meet A.B.'s needs. (*See* Allison Decl., Ex. 5 at 3–4.) Specifically, Plaintiffs noted that while A.B. had made a "year's worth of

progress" during the 2018–2019 school year, she continued to lag behind her peers in her reading comprehension and writing skills.  (*See id*.)

At Windward, A.B.'s homeroom teacher noted that A.B. was "responding well" to Windward's multisensory reading program and was benefiting from "explicit instruction in work-attack strategies."  (*See* Allison Decl., Ex. 6 at 38.)  The report indicated that from November 2019 to February 2020, A.B. had made progress in 17 of 45 Language Arts categories.  (*See id*. at 37.)  At the end of the third grade, A.B. was rated as "Demonstrates Progress" in 3 out of 3 "Decoding" skills, as "Proficient" in 3 out of 4 "Reading Comprehension Skills," and as "Demonstrates Progress" in 4 out of 5 "Written Expression" skills.[5]  (*See* Allison Decl., Ex. 2 at 124.)

### d.  The 2020-2021 School Year (Fourth Grade)

On March 9, 2020, the CSE convened for an annual review and to develop an IEP for the 2020–2021 school year.  (*See* Allison Decl., Ex. 3 at 66–76.)  The IEP for the 2020–2021 school year recommended "90 minutes of direct consultant teacher services per day in English Language Arts ('ELA') and 40 minutes of small group reading services per day," as well as "a number of program modifications and accommodations, including assistive technology, supplementary aids, and testing accommodations."  (*See* Def. 56.1 ¶ 21; Pls. Counter 56.1 ¶ 21.) Plaintiffs again rejected this IEP as inappropriate to meet A.B.'s needs, citing the lack of information about the reading services being offered and the size of class A.B. would be in relative to those at the Windward School.  (*See* Allison Decl., Ex. 6 at 64–65.)  A.B. was

---

[5] Students' skills were evaluated on a three-step scale: "Additional Practice," "Demonstrates Progress" or "Proficient."  (*See* Allison Decl., Ex. 2 at 124.)

unilaterally placed at Windward for the 2020–2021 school year.  (*See* Def. 56.1 ¶¶ 22–23; Pls. Counter 56.1 ¶¶ 22–23.)

On September 10, 2020, the District requested Plaintiffs' consent to conduct a reevaluation of A.B., to which Plaintiffs consented.  (*See* Def. 56.1 ¶¶ 24–26; Pls. Counter 56.1 ¶¶ 24–26.)  The District conducted its reevaluation but was not permitted to conduct classroom observations at Windward.  (*See* Def. 56.1 ¶ 26; Pls. Counter 56.1 ¶ 26.)  On March 31, 2021, in response to Plaintiff's request that the District pay for an IEE, the District proposed to add an additional occupational therapy evaluation and speech-language evaluation, and grant Plaintiffs' request for an IEE in the event that Plaintiffs disagreed with the results of that testing.  (*See* Def. 56.1 ¶¶ 27–28; Pls. Counter 56.1 ¶¶ 27–28.)  On June 18, 2021, the District consented to Plaintiffs' request for an IEE at the District's expense.  (*See* Def. 56.1 ¶ 34; Pls. Counter 56.1 ¶ 34.)  The IEE was conducted on July 16, 2021, and August 6, 2021.  (*See* Def. 56.1 ¶ 35; Pls. Counter 56.1 ¶ 35.)  The evaluation report produced by the IEE was not provided to the District until November 19, 2021.  (*See* Def. 56.1 ¶ 36; Pls. Counter 56.1 ¶ 36.)

Windward also conducted a number of tests at the end of the 2019–2020 school year to assess A.B.'s progress.  (*See* Pls. 56.1 ¶ 138; Def. Counter 56.1 ¶ 138.)  A report produced by the school compared A.B.'s scores to those in 2019, when she entered Windward.  (*See* Pls. 56.1 ¶ 139; Def. Counter 56.1 ¶ 139.)  In Fall 2019, A.B. scored in the 12th percentile in Reading, whereas in Spring 2021 she scored in the 96th percentile.[6]  (*See* Pls. 56.1 ¶ 140; Def. Counter 56.1 ¶ 140.)  She scored in the 26th percentile in Vocabulary in Fall 2019, and the 84th

---

[6] Plaintiffs' 56.1 statement states that she scored in the 96th percentile in Spring 2020, instead of Spring 2021.  (*See* Pls. 56.1 ¶ 140.)  As other evidence in the record indicates A.B. scored in the 96th percentile in reading in May 2021, (*see* Allison Decl., Ex. 6 at 47), the Court takes this to be an error.

percentile in Spring 2021. (*See* Pls. 56.1 ¶ 140; Def. Counter 56.1 ¶ 140.) The tests also revealed that A.B.'s skills had progressed across ten of eleven categories of skills in Spelling from Fall 2019 to Spring 2021. (*See* Allison Decl., Ex. 2 at 143; *see also* Pls. 56.1 ¶ 141; Def. Counter 56.1 ¶ 141.)

        e.   The 2021–2022 School Year (Fifth Grade)

On May 26, 2021, the CSE met for an annual review and to develop an IEP for the 2021–2022 school year. (*See* Def. 56.1 ¶ 29; Pls. Counter 56.1 ¶ 29; Pls. 56.1 ¶ 144; Def. Counter 56.1 ¶ 144.) The IEP for the 2021–2022 school year recommended: "45 minutes of direct consultant teacher services in ELA per day; 45 minutes of direct consultant teacher services in math per day; 40 minutes of group (5:1) Resource Room services per day; 40 minutes of small group reading services per day; and a 30-minute session of individual counseling per week," as well as "a number of program modifications and accommodations, and access to an assistive technology device." (*See* Def. 56.1 ¶ 31; Pls. Counter 56.1 ¶ 31.)

On August 18, 2021, Plaintiffs sent the District a letter indicating they would be unilaterally enrolling A.B. at Windward for the 2021–2022 school year, because they concluded that the District's proposed IEP was not appropriate to meet A.B.'s needs.[7] (*See* Allison Decl., Ex. 5 at 11.) Specifically, Plaintiffs noted that the District failed to identify "the program that would be used as a part of the Reading Services," and this prevented Plaintiffs from ascertaining whether the services would be implemented "with fidelity." (*See id.* at 12.) Further, the letter

---

[7] The letter in question purports to reject the IEP for the "2020–2021 school year," but notes the IEP was the "result of the 5/26/2021 meeting, which took place after the 2020–2021 school year had ended. (*See* Allison Decl., Ex. 5 at 11.) The Court infers that this was a typographical error, and that this letter was intended to reject the 2021–2022 IEP.

noted Plaintiffs' concern about the District's relatively large class sizes and lack of support. (*See id*.)

The November 2021 IEE evaluation reported that A.B.'s decoding skills were average (55th percentile), and her decoding speed was "within the lower limits of the average range" (25th percentile). (*See* Allison Decl., Ex. 4 at 140.) She showed an average reading performance, and a "low average" reading speed. (*See id*.) Her comprehension was in the 84th percentile. (*See id*.) The report diagnosed A.B. with "Specific Learning Disorder (SLD) with Impairment in Written Expression." (*See id*. at 144.) The report recommended that A.B. receive "daily explicit and systematic reading intervention provided in individual and/or small group format (with *no more than three students* per teacher) and which primarily emphasizes phonics instruction," as well as "daily individualized and/or small group (with *no more than 3 students* per instructor) writing intervention that emphasizes explicit instruction in writing mechanics as well as strategies to improve [her] spontaneous written composition skills." (*See id*. at 145–146 (emphasis in original).)

In light of these results, as well as the results from the District's earlier testing, the CSE modified the IEP for the 2021–2022 school year to decrease the student-to-teacher ratio of Resource Room and reading services. (*See* Def. 56.1 ¶ 39; Pls. Counter 56.1 ¶ 39.) The CSE also added two writing goals and a social-emotional goal to the IEP. (*See* Def. 56.1 ¶ 40; Pls. Counter 56.1 ¶ 40.) Thus, the December 2021 IEP provided for 40 minutes of group (3:1) Resource Room services per day and 40 minutes of small group (3:1) reading services per day. (*See* Def. 56.1 ¶ 41; Pls. Counter 56.1 ¶ 41.)

    f.   The 2022–2023 School Year (Sixth Grade)

On May 6, 2022, the CSE met for an annual review and to develop an IEP for the 2022–2023 school year.  (*See* Def. 56.1 ¶ 42; Pls. Counter 56.1 ¶ 42.)  The CSE recommended an IEP that offered "60 minutes of integrated co-teaching [('ICT')] services in ELA daily; 60 minutes of integrated co-teaching services in math daily; small group (3:1) Resource Room services daily; small group (3:1) reading services daily; and one 30-minute session of counseling per week," as well as "a number of program modifications and accommodations, [and] access to assistive technology."  (*See* Def. 56.1 ¶ 46; Pls. Counter 56.1 ¶ 46.)  Plaintiffs once again rejected this IEP as inappropriate to meet A.B.'s needs, citing the lack of information about the system that would be used to meet A.B.'s needs, as well as the relatively larger class sizes in the District.  (*See* Allison Decl., Ex. 5 at 15–16.)  A.B. was unilaterally enrolled in Windward for the 2022–2023 school year.  (*See* Def. 56.1 ¶ 48; Pls. Counter 56.1 ¶ 48.)

    2.   The Parents' Due Process Complaint

On or about February 3, 2023, Plaintiffs filed an initial administrative due process complaint and request for an impartial hearing.  (*See* Def. 56.1 ¶ 49; Pls. Counter 56.1 ¶ 49.)  The due process complaint alleged that the District had failed to offer A.B. a FAPE for the 2019–2020, 2020–2021, 2021–2022, and 2022–2023 school years, that Windward was an appropriate placement for A.B., and that the equities tipped in favor of Plaintiffs.  (*See* Def. 56.1 ¶ 50; Pls. Counter 56.1 ¶ 50.)  Accordingly, Plaintiffs sought reimbursement of the Windward tuition and related expenses for each of the challenged years.  (*See* Def. 56.1 ¶ 50; Pls. Counter 56.1 ¶ 50.)

    3.   The IHO Decision

A hearing was held before IHO Jean M. Lucasey and consisted of six hearing dates, which concluded on April 27, 2023.  (*See* Def. 56.1 ¶ 51; Pls. Counter 56.1 ¶ 51.)  After the final

hearing date, each side submitted a post-hearing brief.  (*See* Def. 56.1 ¶ 59; Pls. Counter 56.1 ¶ 59.)

On August 31, 2023, the IHO issued its decision.  (*See* Def. 56.1 ¶ 60; Pls. Counter 56.1 ¶ 60.; *see also* Allison Decl., Ex. 1 at 44 (Dkt. No. 26-1).)  The IHO concluded that the District had failed to offer a FAPE for the 2019–2020 and 2020–2021 school years.  (*See* Allison Decl., Ex. 1 at 70–71.)  As to the 2019–2020 school year, the IHO found that nothing in the IEP demonstrated that the curriculum was sufficiently "intensive" or that "it contained the amount of multi-sensory instruction necessary to address [A.B.'s] dyslexia."  (*See id*. at 53.)  As to the 2020–2021 school years, the IHO concluded that the IEP failed to address A.B.'s need for support outside of English class and her "continuing need for intensive reading intervention throughout the school day."  (*See id*. at 70–71.)  As for the 2021–2022 and 2022–2023 school years, the IHO concluded that the IEPs were appropriately tailored to A.B.'s needs.  (*See id*. at 71.)  The IHO also concluded that Windward provided an appropriate education for the challenged school years, and that no equitable considerations counseled against offering tuition reimbursement for the years for which the District had failed to offer a FAPE.  (*See id*. 72–73.)

4.  The SRO Decision

The Parties appealed the IHO's decision to an SRO.  (*See id*. at 90–194.)  Plaintiffs argued that the IHO had erred in concluding that the District had offered a FAPE for the 2021–2022 and 2022–2023 school years, and, naturally, Defendant argued that the IHO erred in concluding that the District had failed to offer a FAPE for the 2019–2020 and 2020–2021 school years.  (*See id*. at 90–194.)  The District further argued that the IHO erred when it concluded that Windward was appropriate placement for A.B, and that the equities tipped in favor of the

Parents.  (*See id*. at 98–99.)  On November 9, 2023, the SRO issued its decision.  (*See id.* at 11–40.)  The SRO sustained the District's appeal and denied Plaintiffs' appeal.  (*See id*. at 39.)

The SRO concluded that as to the 2019–2020 school year, the IHO erred in concluding that the IEP did not provide sufficient multisensory education. (*See id.* at 26–27.)  The SRO reasoned that the IHO overlooked the fact that A.B. was already receiving multisensory education, as evidenced by the May 2019 IEP which recommended "a multisensory approach" to reading.  (*See id*. at 26.)  The SRO further noted that A.B.'s special education teacher had testified that she employed multisensory reading and writing programs during the year.  (*See id*.)

The SRO also rejected the IHO's contention that the 2019 IEP was insufficiently intensive and failed to specify the quantum of multisensory education.  (*See id*. at 28.)  In so concluding, the SRO found that that neither the September 2018 IEE nor any other documentation available to the CSE at the time the IEP was developed called for a specific *amount* of multisensory education, and that there was no indication that A.B.'s education had thus far been insufficient to meet her needs.  (*See id*.)

As to the 2020–2021 school year, the SRO found that the IEP was sufficient to provide A.B. with a FAPE.  (*See id*. at 30–31.)  The SRO rejected the IHO's conclusion that the IEP was insufficient because it failed to provide specialized instruction in areas outside of the English Language Arts, and because it failed to account for the progress A.B. had made in Windward's small classrooms and with reading support in all content areas.  (*See id*. at 31.)  The SRO noted that the IEP was not required to replicate the private school setting in order to offer a FAPE to students.  (*See id*.)  Further, the SRO pointed to the fact that A.B.'s progress reports showed that she was "frequently" or "consistently" meeting expectations in other content areas.  (*See id*.)

Finally, the SRO noted that A.B.'s IEP made provisions for assistive technology throughout the day.  (*See id*.)

As to the 2021-2022 school year, the SRO upheld the IHO's conclusion that the IEP had provided a FAPE.  (*See id*. 32–34.)  In their cross-appeal to the SRO, the Parents challenged the IHO's conclusion that the IEP had provided a FAPE because the private neuropsychologist recommended that A.B. remain in a special education school.  (*See id*. at 24–35.)  The SRO noted that while the CSE was required to consider the IEE provided by the neuropsychologist, it was not required to adopt its recommendations.  (*See id*. at 35.)  The SRO concluded that in light of the deference that should be afforded to the district staff over the private neuropsychologist and the fact that the IDEA requires CSEs to consider placing students with non-disabled peers to the extent possible, the IEP was appropriate.  (*See id*. at 35–36.)

The Parents also challenged the IHO's conclusion that the 2022–2023 IEP was appropriate, because they argued it did not align with the neuropsychologist's recommendations.  (*See id.* 38.)  As to this, the SRO concluded that because A.B.'s scores across a range of progress reports were in the "average range," the District's recommendations were appropriate to provide A.B. with a FAPE.  (*See id*. 39.)

B.  Procedural Background

The Parents filed the operative Complaint on March 6, 2024.  (*See generally* Compl.)  Pursuant to a case management plan set by the Court, the Parties submitted the Administrative Hearing Record on October 31, 2024.  (*See generally* Allison Decl.)  On November 18, 2024, the District moved for summary judgment.  (*See generally* Def. Not.; Def. Mem.; Def. 56.1.)  Plaintiffs moved for summary judgment on the same day.  (*See generally* Pls. Mem.; Pls. 56.1.)  On December 18, 2024, Defendant filed its Opposition and Counter 56.1 Statement.  (*See*

*generally* Def. Opp. to Pls. Mot. for Summ. J. ("Def. Opp.") (Dkt. No. 34); Def. Counter 56.1.)

On December 18, 2024, Plaintiffs filed a Counter 56.1 Statement.  (*See generally* Pls. Counter

56.1.)

## II.  Discussion

### A.  Statutory Background

The IDEA requires that states receiving federal funds provide a "free appropriate public

education"—that is, a FAPE—to "all children with disabilities."  20 U.S.C. § 1412(a)(1)(A);

*accord Endrew F. ex rel. Joseph F. v. Douglas Cnty. Sch. Dist. RE-1*, 580 U.S. 386, 390 (2017).

A FAPE "includes both 'special education' and 'related services,'" which a state must provide to

a disabled child "in conformity with the child's [IEP.]"  *Endrew F.*, 580 U.S. at 390–91

(alteration adopted) (quoting 20 U.S.C. § 1401(9)(D)); *see also L.S. v. Union Free Sch. Dist. of

the Tarrytowns*, No. 22-CV-10835, 2024 WL 1859970, at *12 (S.D.N.Y. Apr. 29, 2024) ("The

IDEA requires States receiving federal funds to provide all children with disabilities with a

FAPE, which includes special education and related services tailored to meet the unique needs of

a particular child." (quotation marks omitted) (quoting in part *Mr. P v. W. Hartford Bd. of Educ.*,

885 F.3d 735, 741 (2d Cir. 2018))).  "School districts, through a CSE, are responsible for

formulating a written IEP for every qualifying child."  *L.O. v. N.Y.C. Dep't of Educ.*, 822 F.3d

95, 102 (2d Cir. 2016) (footnote omitted); *see also* 20 U.S.C. § 1414(d) (same).[8]  "The IEP sets

out the child's present educational performance, establishes annual and short-term objectives for

---

[8] "In New York, the state has assigned responsibility for developing IEPs to local CSEs.
CSEs are comprised of members appointed by the local school district's board of education, and
must include the student's parent(s), a regular or special education teacher, a school board
representative, a parent representative, and others."  *L.O.*, 822 F.3d at 102 n.4 (alteration
adopted, citations and quotation marks omitted); *see also* N.Y. Educ. Law § 4402(1)(b)(1)(a).

improvements in that performance, and describes the specially designed instruction and services that will enable the child to meet those objectives." *L.O.*, 822 F.3d at 102–03 (quotation marks omitted); *see also Endrew F.*, 580 U.S. at 390–91 (listing statutory objectives and procedures applicable to IEPs).

"The IDEA . . . requires an educational program reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Endrew F.*, 580 U.S. at 403; *see also Mr. P*, 885 F.3d at 757 ("Prior decisions of this Court are consistent with the Supreme Court's decision in *Endrew F.* [requiring that an educational program be reasonably calculated to enable a child's progress in light of the child's circumstances.]"); *L.O.*, 822 F.3d at 103 ("To comply with the provisions of the IDEA, the IEP must be reasonably calculated to enable the child to receive educational benefits." (quotation marks omitted)).  There is no "bright-line rule" determining "what 'appropriate' progress" means; rather, "[t]he adequacy of a given IEP turns on the unique circumstances of the child for whom it was created." *Endrew F.*, 580 U.S. at 403–04; *see also S.C. v. Katonah-Lewisboro Cent. Sch. Dist.*, 175 F. Supp. 3d 237, 250 (S.D.N.Y. 2016) ("The IDEA does not itself articulate any specific level of educational benefits that must be provided through an IEP." (quotation marks omitted)), *aff'd sub nom. J.C. v. Katonah-Lewisboro Sch. Dist.*, 690 F. App'x 53 (2d Cir. 2017) (summary order).  The Supreme Court has explained that "[f]or children receiving instruction in the regular classroom, this would generally require an IEP reasonably calculated to enable the child to achieve passing marks and advance from grade to grade." *Endrew F.*, 580 U.S. at 394 (quotation marks omitted).  But, for "a child who is not fully integrated in the regular classroom and not able to achieve on grade level . . . his [or her] IEP . . . must be appropriately ambitious in light of his [or her] circumstances." *Id.* at 402.  In other words, an IEP "providing merely more than de minimis progress from year to

year" is insufficient, *id.* at 402–03 (italics and quotation marks omitted), but, it also need not

"furnish[] . . . every special service necessary to maximize each handicapped child's potential,"

*Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 199 (1982), or

"provide[] everything that might be thought desirable by loving parents," *S.C.*, 175 F. Supp. 3d

at 250 (quotation marks omitted); *see also L.S.*, 2024 WL 1859970, at *12 (same).

Moreover, "[b]ecause the law expresses a strong preference for children with disabilities

to be educated, 'to the maximum extent appropriate,' together with their non-disabled peers,

special education and related services must be provided in the least restrictive setting consistent

with a child's needs," and "[o]nly 'when the nature or severity' of a child's disability is such

'that education in regular classes with the use of supplementary aids and services cannot be

achieved satisfactorily' should a child be segregated." *Walczak v. Fla. Union Free Sch. Dist.*,

142 F.3d 119, 122 (2d Cir. 1998) (quoting 20 U.S.C. § 1412(5); *id.* § 1401(a)); *see also Avaras*

*ex rel. A.A. v. Clarkstown Cent. Sch. Dist.*, No. 18-CV-6964, 2019 WL 4600870, at *2 (S.D.N.Y.

Sept. 21, 2019) ("In addition to providing an education that is likely to produce progress and

tailored to the unique needs of the child, the program must be offered in the least restrictive

environment[.]" (citing 20 U.S.C. § 1412(a)(5)(A))).

"[The] IDEA also provides a variety of procedural safeguards with respect to the

provision of [a FAPE] by school districts." *Lillbask ex rel. Mauclaire v. State of Conn. Dep't of*

*Educ.*, 397 F.3d 77, 81–82 (2d Cir. 2005) (quotation marks omitted); *accord B.M. v.*

*Pleasantville Union Free Sch. Dist.*, No. 20-CV-2192, 2021 WL 4392281, at *10 (S.D.N.Y.

Sept. 24, 2021); *see also* 20 U.S.C. § 1415 (listing safeguards). "[A]dequate compliance with

the procedures prescribed would in most cases assure much if not all of what Congress wished in

the way of substantive content in an IEP." *Rowley*, 458 U.S. at 206. On the other hand,

however, not "every procedural error in the development of an IEP renders that IEP legally inadequate under the IDEA," *A.C. ex rel. M.C. v. Bd. of Educ. of The Chappaqua Cent. Sch. Dist.*, 553 F.3d 165, 172 (2d Cir. 2009) (quotation marks omitted), although "[m]ultiple procedural violations may cumulatively result in the denial of a FAPE even if the violations considered individually do not," *R.E. v. N.Y.C. Dep't of Educ.*, 694 F.3d 167, 190 (2d Cir. 2012). Specifically, a procedural violation violates the IDEA only if it:

> ([i]) impeded the child's right to a free appropriate public education;
>
> ([ii]) significantly impeded the parents' opportunity to participate in the decisionmaking process regarding the provision of a free appropriate public education to the parents' child; or
>
> ([iii]) caused a deprivation of educational benefits.

*Winkelman ex rel. Winkelman v. Parma City Sch. Dist.*, 550 U.S. 516, 525–26 (2007) (citation and quotation marks omitted); *see also Y.N. v. Bd. of Educ. of Harrison Cent. Sch. Dist.*, No. 17-CV-4356, 2018 WL 4609117, at *14 (S.D.N.Y. Sept. 25, 2018) (same).

Finally, in New York, if a parent believes that his or her child is being denied a FAPE, the parent may request an "[i]mpartial due process hearing," 20 U.S.C. § 1415(f), before an IHO appointed by a local school district board or state agency responsible for providing education to students with disabilities, *see* N.Y. Educ. Law § 4404(1)(a); *see also L.S.*, 2024 WL 1859970, at *13 ("Parents are entitled to challenge 'any matter relating to the identification, evaluation or educational placement of the student or the provision of a free appropriate public education to the student.'" (quoting N.Y. Educ. Law § 4404(1))). The IHO's decision may be appealed to an SRO, *see* 20 U.S.C. § 1415(g); N.Y. Educ. Law § 4404(2), and the SRO's decision may be challenged in either state or federal court, *see* 20 U.S.C. § 1415(i)(2)(A); *see also L.O.*, 822 F.3d at 103 (describing the appeal process in New York); *L.S.*, 2024 WL 1859970, at *13 (same).

B. <u>Standard of Review</u>

Unlike an ordinary summary judgment motion, the existence of a disputed issue of

material fact will not necessarily defeat a motion for summary judgment in the IDEA context.

*See T.P. ex rel. S.P. v. Mamaroneck Union Free Sch. Dist.*, 554 F.3d 247, 252 (2d Cir. 2009) (per

curiam); *see also B.M.*, 2021 WL 4392281, at *10 (same); *G.B. ex rel. N.B. v. Tuxedo Union

*Free Sch. Dist.*, 751 F. Supp. 2d 552, 570 (S.D.N.Y. 2010) (same), *aff'd*, 486 F. App'x 954 (2d

Cir. 2012) (summary order).  Instead, summary judgment in IDEA cases is "in substance an

appeal from an administrative determination, not a summary judgment."  *Lillbask*, 397 F.3d at 83

n.3 (quoting *Capistrano Unified Sch. Dist. v. Wartenberg*, 59 F.3d 884, 892 (9th Cir. 1995)); *see

also L.S.*, 2024 WL 1859970, at *11 ("[S]ummary judgment [in the IDEA context] 'is a

pragmatic procedural mechanism for reviewing administrative decisions.'" (quoting *T.P.*, 554

F.3d at 252)).  The Court's review therefore "requires a more critical appraisal of the agency

determination than clear-error review but falls well short of complete de novo review."  *L.O.*,

822 F.3d at 108 (quotation marks and italics omitted).  Accordingly, the Court must "engage in

an independent review of the administrative record and make a determination based on a

preponderance of the evidence."  *M.H. v. N.Y.C. Dep't of Educ.*, 685 F.3d 217, 240 (2d Cir.

2012) (quotation marks omitted); *accord B.M.*, 2021 WL 4392281, at *10.

However, such a review "is by no means an invitation to the courts to substitute their own

notions of sound educational policy for those of the school authorities which they review."

*Rowley*, 458 U.S. at 206; *accord B.M.*, 2021 WL 4392281, at *10 .  "To the contrary, federal

courts reviewing administrative decisions must give due weight to these proceedings, mindful

that the judiciary generally lacks the specialized knowledge and experience necessary to resolve

persistent and difficult questions of educational policy."  *M.H.*, 685 F.3d at 240 (quotation marks

omitted).  To merit deference, the IHO's and SRO's decisions must be "thorough and careful." *S.C.*, 175 F. Supp. 3d at 252 (quotation marks omitted); *accord Y.N.*, 2018 WL 4609117, at \*14. The quality of the decision can be judged on factors such as whether it is "well-reasoned" and "based on substantially greater familiarity with the evidence and the witnesses than the reviewing court."  *R.E.*, 694 F.3d at 189 (quotation marks omitted); *C.L. v. Scarsdale Union Free Sch. Dist.*, 744 F.3d 826, 838 (2d Cir. 2014) (similar); *see also L.O.*, 822 F.3d at 109 ("To merit deference, the SRO's or IHO's factual findings must be reasoned and supported by the record." (alteration adopted and quotation marks omitted)).  "Additionally, the Second Circuit has instructed courts that deference to an SRO's decision is more appropriate when the substantive adequacy of an IEP, as opposed to the procedural adequacy, is at issue; when the decision involves a dispute over an appropriate educational methodology versus determinations regarding objective indications of progress; and when the district court's decision is based solely on the administrative record that was before the SRO."  *B.M.*, 2021 WL 4392281, at \*10 (citing *M.H.*, 685 F.3d at 244).

Where, as here, the IHO and SRO reach some contrary conclusions, "reviewing courts are not entitled to adopt the conclusions of either state reviewer according to their own policy preferences or views of the evidence; courts must defer to the reasoned conclusions of the SRO as the final state administrative determination."  *M.H.*, 685 F.3d at 246; *see also C.L.*, 744 F.3d at 838 (similar); *A.C.*, 553 F.3d at 171 (noting that "[i]f the SRO's decision conflicts with the earlier decision of the IHO, the IHO's decision may be afforded diminished weight," because the court must "defer to the final decision of the state authorities" (quotation marks omitted)). However, if the Court concludes that

> the SRO's determinations are insufficiently reasoned to merit . . . deference, and in
> particular where the SRO rejects a more thorough and carefully considered decision

of an IHO, it is entirely appropriate for the court, having in its turn found the SRO's
conclusions unpersuasive even after appropriate deference is paid, to consider the
IHO's analysis.

*M.H.*, 685 F.3d at 246; *accord C.L.*, 744 F.3d at 838.  Therefore, this Court "must defer to the

SRO's decision on matters requiring educational expertise unless it concludes that the decision

was inadequately reasoned, in which case a better-reasoned IHO opinion may be considered

instead."  *R.E.*, 694 F.3d at 189; *see also B.M.*, 2021 WL 4392281, at *10 ("The Second Circuit

has explained that the deference owed to an SRO's decision depends on the quality of that

opinion, or its persuasiveness." (alterations adopted and citation omitted)).

    C.  <u>Analysis</u>

      "Parents who believe that a FAPE is not being provided to their child may unilaterally

enroll the child in a private school and seek tuition reimbursement from the school district."

*M.O. v. N.Y.C. Dep't of Educ.*, 793 F.3d 236, 239 (2d Cir. 2015) (alteration adopted and citation

omitted); *L.S.*, 2024 WL 1859970, at *13 ("If a school district fails to offer a FAPE, parents may

unilaterally enroll their child in private school and seek tuition reimbursement." (citation

omitted)); *Bd. of Educ. of Poughkeepsie City Sch. Dist. v. O'Shea*, 353 F. Supp. 2d 449, 454

(S.D.N.Y. 2005) ("If a state receiving IDEA funding fails to give a disabled child a FAPE . . . the

child's parent may remove the child to an appropriate private school and then seek retroactive

tuition reimbursement from the state." (citation omitted)).  To determine whether reimbursement

is warranted, courts apply a three-part test known as the *Burlington*/*Carter* test "after [any] IEP

dispute is resolved."  *Ventura de Paulino v. N.Y.C. Dep't of Educ.*, 959 F.3d 519, 526–27 & n.19

(2d Cir. 2020) (emphasis omitted) (discussing the test named after the Supreme Court's decisions

in *Florence Cnty. Sch. Dist. Four v. Carter By & Through Carter*, 510 U.S. 7 (1993), and *School

Committee of the Town of Burlington v. Department of Education*, 471 U.S. 359 (1985)).  Under

this test, "[a] parent can obtain [tuition] reimbursement if: '(1) the school district's proposed placement violated the IDEA' by, for example, denying a FAPE to the student because the IEP was inadequate; (2) 'the parents' alternative private placement was appropriate'; and (3) 'equitable considerations favor reimbursement.'"  *Id*. at 526–27 (quoting *T.M. ex rel. A.M. v. Cornwall Cent. Sch. Dist.*, 752 F.3d 145, 152 (2d Cir. 2014)).

The Court will address the Parties' arguments with respect to each *Burlington*/*Carter* factor only to the extent necessary to resolve the instant Motion.

    1.  <u>Substantive Challenges to the IEPs</u>

        a.  <u>2019–2020 (Third Grade)</u>

Plaintiffs contend that Defendant failed to provide A.B. with a FAPE during the 2019–2020 school year because the May 2019 IEP was not reasonably calculated to enable her to make progress appropriate in light of her circumstances.  (*See* Pls. Mem. 11–16, 18–35.)

As discussed above, in considering the May 2019 IEP, the CSE reviewed A.B.'s performance on i-Ready tests, the Word Identification and Spelling Test ("WIST"), the Beery-Buktenica Developmental Test of VMI, the Bruininks-Oseretsky Test of Motor Proficiency, the Gray Oral Reading Tests, the Conners 3: Teacher Report, the Wechsler Intelligence Scale for Children, Woodcock-Johnson-4 Test of Cognitive Abilities.  (*See* Allison Decl., Ex. 3 at 56–57.) The report also relied on A.B.'s March 2019 report card, her April 2019 educational evaluation, and the May 2019 interim report.  (*See id*. at 56)  The May 2019 IEP also included information from the District's initial evaluation of A.B., as well as the private IEE she received in September 2018.  (*See id.* at 54–57.)  The May 2019 IEP recommended 40 minutes of time in the Resource Room per day, in a class size of no more than 5 students to one teacher.  (*See id*. 62.)

As noted by the Parents, this IEP removed the consultant teacher services A.B. received in class during her second-grade year. (*Compare id*. at 139 *with id*. at 62.)

Plaintiffs argue that the May 2019 IEP was inadequate for a number of reasons, including because: (1) the May 2019 IEP failed to "identify any particular program to address A.B.'s needs"; (2) to the extent the May 2019 IEP purported to apply the Wilson Reading System ("WRS"), the District did not and could not apply WRS "with the requisite fidelity" necessary to make progress; (3) the May 2019 IEP inappropriately eliminated the consultant teacher resource based on an overestimation of A.B.'s the progress during the previous year; and (4) the May 2019 IEP did not provide for the appropriate amount of multisensory instruction. (*See generally* Pl. Mem.)

"To the extent Plaintiff[s are] arguing that the IEP is defective for failing to *specify* a particular 'educational methodology' or peer-reviewed method, this argument fails" because an IEP "need not identify a specific 'educational methodology' to satisfy the IDEA." *C.S. v. Yorktown Cent. Sch. Dist.*, No. 16-CV-9950, 2018 WL 1627262, at *16, 27 (S.D.N.Y. Mar. 30, 2018) (emphasis in original) (quoting *K.L. ex rel. M.L. v. N.Y.C. Dep't of Educ.*, No. 11-CV-3733, 2012 WL 4017822, at *12 (S.D.N.Y. Aug. 23, 2012), *aff'd*, 530 Fed. App'x 81 (2d Cir. 2013) (summary order)). [9]  Similarly, the Court notes that the District was not required to apply

---

[9] Of course, where there is a "clear consensus" that a particular service or teaching method is required, courts have found that "an IEP formulated for the child that fails to provide services consistent with that consensus is not reasonably calculated to enable the child to receive educational benefits, and the state's determination to the contrary is thus entitled to no deference because it is unsupported by a preponderance of the evidence." *A.M. v. N.Y.C. Dep't of Educ.*, 845 F.3d 523, 543 (2d Cir. 2017) (citation omitted).

Here, Plaintiffs point to no evidence suggesting that there was a "consensus" that A.B. was specifically entitled to the Wilson Reading System, (*see generally* Pls. Mem.), and therefore the IEP was not inappropriate insofar as it did not explicitly call for the use of this system, *see C.S.*, 2018 WL 1627262 at *16 (rejecting that a particular methodology was required where the

the Wilson Reading System with "fidelity," as argued by Plaintiffs.  *See T.C. ex rel. I.M. v. William Floyd Union Free Sch. Dist.*, 774 F. Supp. 3d 583, 614–615 (E.D.N.Y. 2025) (upholding SRO's determination that the IEP was appropriate where parents objected that the teacher was not properly certified in the Wilson Reading System because the IEP "did not mandate strict adherence to that methodology"); *A.G. ex rel. J.G. v. Bd. of Educ. of Arlington Cent. Sch. Dist.*, No. 16-CV-1530, 2017 WL 1200906, at *9 (S.D.N.Y. Mar. 29, 2017) (rejecting the parents' argument that the district should have been applying the Wilson Reading System with "fidelity" because "there is no requirement that any particular methodology be used"); *accord  N.K.M. ex rel. G.M. v. Rye City Sch. Dist.*, No. 23-CV-1109, 2024 WL 4803941, at *14 (S.D.N.Y. Nov. 15, 2024) ("'[A] CSE is not required to specify methodology in an IEP,' and '[u]nless a specific methodology is required for a student to receive an educational benefit, the choice of pedagogic methodology is appropriately left to the teacher.'" (quoting *T.C. v. N.Y. City Dep't of Educ.*, No. 15-CV-3477, 2016 WL 1261137, at *14 (S.D.N.Y. Mar. 30, 2016)).

The Court also concludes that the SRO's judgment that the elimination of the consultant teacher resource was appropriate is entitled to deference because it was "thorough, consider[ed] all evidence presented by parties, and . . . set forth in well-reasoned, detailed opinion."  *N.K.M.*, 2024 WL 4803941, at *14 (citing *P.C. v. Rye City Sch. Dist.*, 232 F. Supp. 3d 394, 410 (S.D.N.Y. 2017)).  The SRO concluded that A.B.'s substantial improvements during the 2018– 2019 school year supported the District's testimony that she was competent to perform without a consultant teacher during her classes.  (*See* Allison Decl., Ex. 1 at 25–26.)  This evidence included impartial hearing testimony suggesting that A.B. was "making a great deal of progress,"

---

plaintiff "cited no evidence demonstrating such a 'clear consensus' that [the student] was entitled to a specific service or teaching method that her IEP did not provide").

and "functioning at or above grade level" in many areas.[10]  (*See id*. at 25 (internal quotation marks omitted).)  The SRO also reviewed A.B.'s WIST test scores, where A.B. demonstrated marked improvement.  (*See id*.; *Compare* Allison Decl., Ex. 6 at 9 (finding that the student scored in the third percentile for "Word Identification," ninth percentile for "Spelling," third percentile for "Fundamental Literacy Ability" and second percentile for "Sound-Symbol Knowledge") *with id*. at 18 (finding that A.B. scored in the 23rd percentile for "Word Identification," 30th percentile for "Spelling," 25th percentile for "Fundamental Literacy Ability," 65th percentile for "Sound-Symbol Knowledge").)  The SRO also relied on information suggesting that A.B. had progressed from a 1.3 to a 2.3 on the Wilson Reading System, that she had improved to a J reading level.  (*See* Allison Decl., Ex. 1 at 25.)  Finally, the SRO credited information suggesting that A.B.'s reading and writing had improved in other contexts, her IEP progress report suggesting she was "progressing satisfactorily" towards a number of goals, and her progress reports indicating that she had moved from "Approaching Secure" to "Secure" in numerous skills related to the language arts.  (*See id*.)

In their Motion, Plaintiffs primarily challenge the SRO's determination on the grounds that it misinterpreted and overstated A.B.'s progress.  (*See* Pls. Mem. 14–16.)  Plaintiffs first argue that the WIST results were unduly high because the test "was not properly administered."

---

[10] Plaintiffs also challenge the SRO's reliance on these comments as inappropriate use of "retrospective testimony."  (*See* Pls. Mem. 24–27.)  But this argument misunderstands the nature of "retrospective testimony."  Per the Second Circuit, retrospective testimony is "testimony that certain services not listed in the IEP would actually have been provided to the child if he or she had attended the school district's proposed placement."  *R.E.*, 694 F.3d at 185.  The statements that Plaintiffs point to as "retrospective testimony" merely explain how the CSE determined the provision of consultant teacher services was unnecessary.  (*See* Pls. Mem. 25.)  They do not assert that certain services would have been provided, even though they were not named in the IEP.  Therefore, this evidence does not constitute retrospective testimony.

(*See id*. at 14.)  In support of this argument, Plaintiffs point to two pages in the transcript from the impartial hearing.  (*See id*. (citing Allison Decl., Ex. 9 at 404–405).)  It is true that the transcript evinces a disagreement between Plaintiffs' attorney and A.B.'s special education teacher as to whether the teacher mis-graded "self-corrections" on A.B.'s 2018 WIST, thus artificially reducing the number of questions that A.B. correctly identified.  (*See* Allison Decl., Ex. 9 at 404–405.)  But the transcript only demonstrates a disagreement as to this issue, and Plaintiffs point to no other evidence suggesting their interpretation of the WIST grading system is correct.  (*See generally* Pls. Mem.)  Furthermore, to the extent Plaintiffs are correct that the 2018 WIST scores were artificially deflated by such an error, the alleged error appears to only affect two of the questions.  (*See* Allison Decl., Ex. 6 at 10.)

Plaintiffs argue that the SRO misinterpreted A.B.'s progress towards her IEP Goals because her final progress report stated that she had "Progress[ed] Satisfactorily" in several of her reading and writing goals, instead of indicating that she had "Achieved" those goals.  (*See* Pls. Mem. 14–15.)  Plaintiffs argue that the SRO should have interpreted the progress report as demonstrating that A.B. failed to meet the annual goal, because she had not "Achieved" the annual goal.  (*See id*.)  But "whether [A.B.] achieved the goals set forth in the [2018] IEP is not the controlling issue; rather, it is her *progress* toward achieving them." *C.S.*, 2018 WL 1627262, at *21.  Here, it was proper for the SRO to conclude that A.B. had made progress towards the goals set at the annual review, even where she had not "Achieved" each goal.  *See C.S.*, 2018 WL 1627262, at *21 (crediting the SRO's conclusion that the IEP Progress report demonstrated progress because "even where [the student] did not achieve a goal, the report indicates that she made *progress* toward it" (emphasis in original)); *M.H. v. Pelham Union Free Sch. Dist.*, 168 F. Supp. 3d 667, 676 (S.D.N.Y. 2016) (affirming the SRO's conclusion that the student had made

progress where their IEP Progress report indicated that the student had "achieved" fewer than half of the goals, was "progressing satisfactorily" towards six goals, was "progressing gradually" toward four goals, and was "progressing inconsistently" towards three goals); *Gavrity v. New Lebanon Cent. Sch. Dist.*, No. 05-CV-1024, 2009 WL 3164435, at *31 (N.D.N.Y. Sept. 29, 2009) (upholding SRO's determination that student was making progress where forms containing the IEP's annual goals indicated that the student was "progressing satisfactorily," "although [the student] did not meet the objectives"). For that reason, Plaintiffs' argument as to this issue is unavailing.

Moreover, contrary to Plaintiffs' objection, the SRO correctly interpreted A.B.'s 2018–2019 report card as indicating that she had made progress over the course of the 2018–2019 school year. At the outset of the school year, A.B. was considered "Secure" (the highest level of academic performance) in four of the 19 skills that the report card tracks in English Language Arts. (*See* Allison Decl., Ex. 6 at 70.) By the end of the school year, she was considered "Secure" in twelve of those skills and had demonstrated improvement across every other skill category in the English Language Arts. (*See id.*) This evidence therefore supports the SRO's determination that the A.B. had made significant progress during the 2018–2019 school year.[11]

---

[11] The Court also notes that Plaintiffs failed to provide any evidence in support of their argument that A.B.'s advancement in the Wilson Reading System ("WRS") was "de minimis." (*See* Pls. Mem. 14.) Moreover, even if A.B.'s progress in WRS was in fact "de minimis," the other objective evidence in the record—including A.B.'s improvement on her WIST scores, her IEP report, the fact that her reading had moved from a level C/D to a level J/K, and her report card—supports the SRO's finding as to A.B.'s progress. *See L.S.*, 2024 WL 1859970, at *14 (upholding SRO's determination that IEP was appropriate where the student's "inconsistent grades" were treated as "one piece of the evaluative record"); *C.S.*, 2018 WL 1627262, at *22–23 (upholding SRO's determination that an IEP was appropriate in spite of the student's low test scores "based on other objective evidence in the record"); *M.H.*, 168 F. Supp. 3d at 677 (concluding that the "hearing record as a whole" supported the argument that the student had made meaningful progress, even where some objective indicators showed a decline in

For the foregoing reasons, and in light of the fact that "[t]he Second Circuit has []
cautioned that '[a]n assessment of educational progress is a type of judgment for which the
district court should defer to the SRO's educational experience,'" *S.H. v. N.Y.C. Dep't of Educ.*,
No. 09-CV-6072, 2011 WL 609885, at *8 (S.D.N.Y. Feb. 18, 2011) (quoting *M.S. ex rel. S.S. v.
Bd. of Educ.*, 231 F.3d 96, 105 (2d Cir. 2000), *abrogated in part on other grounds*, *Schaffer v.
Weast*, 546 U.S. 49 (2005)); *see also J.G. v. Brewster Cent. Sch. Dist.*, No. 15-CV-3612, 2018
WL 749010, at *10–11 (S.D.N.Y. Feb. 7, 2018) (deferring to SRO's determination of student's
progress in part because "administrative agencies have special expertise" in the matter (citation
omitted)), the Court concludes that the lack of direct consultant teacher services in the 2019–
2020 IEP did not violate A.B.'s right to a FAPE.

Plaintiffs also challenge the SRO's conclusion that the amount of multisensory
instruction in the 2019 IEP was sufficient. (*See* Pls. Mem. 12–13.)  As noted above, the IHO
concluded that the 2019 IEP was inadequate because it was not sufficiently intensive and did not
contain the amount of multisensory instruction necessary to address A.B.'s needs.  (*See* Allison
Decl., Ex. 1 at 53.)  The SRO rejected this conclusion, holding that there was no evidence in the
record to support the notion that a particular quantum of multisensory instruction was required.
(*See id*. at 28.)  The SRO therefore found that the 2019 IEP was adequate in light of the fact that
A.B. had made "meaningful progress" in the 2018–2019 school year, and that the 2019 IEP
provided for multisensory education.  (*See id*.)  Plaintiffs argue that decreasing the amount of
multisensory instruction was inappropriate, because A.B. had made more progress during the

---

performance); *H.W. v. New York State Educ. Dep't*, No. 13-CV-3873, 2015 WL 1509509, at *4
(E.D.N.Y. Mar. 31, 2015) (upholding the SRO's determination that an IEP was adequate on the
basis that "the hearing record as a whole supports the conclusion that the student made
meaningful progress," even assuming that tests showed minimal progress).

2018–2019 school year (when she was receiving more multisensory instruction) than she had in 2016–2017 or 2017–2018.  (*See* Pls. Mem. 12–13.)

As discussed above, the SRO's interpretation of A.B.'s progress during the 2018–2019 year was supported by the record evidence and entitled to deference.  Furthermore, the Court concludes that it was reasonable for the SRO to find that A.B.'s improvement indicated that less support would be necessary in the coming year.  *See M.T. v. N.Y.C. Dep't of Educ.*, 200 F. Supp. 3d 447, 459 (S.D.N.Y. 2016) ("[T]he SRO reasonably concluded that, with continued improvement, less [] support would be necessary."); *accord A.L. ex rel. C.L. v. N.Y.C. Dep't of Educ.*, No. 16-CV-2827, 2017 WL 11697978, at *10 (S.D.N.Y. July 11, 2017) (holding that an issue of whether the IEP's recommended interventions were intensive enough was "exactly the type of educational policy decision to which [the court] must defer [to the SRO]").

Finally, Plaintiffs challenge the SRO's decision with respect to the sufficiency of the writing goals in the 2019–2020 IEP, and in particular that the 2019–2020 IEP (1) omitted the 2018 writing goal involving word problems and (2) that the IEP failed to require that writing instruction be presented as a "series of discrete states."  (*See* Pls. Mem. 29–30.)  As the SRO correctly noted, A.B.'s May 2019 IEP noted that she was "at or above" grade level in her ability to organize her writing and thoughts, and that she completed writing tasks at grade level expectations.  (*See* Allison Decl., Ex. 1 at 25–26; Allison Decl., Ex. 3 at 59.)  The 2019 IEP notes that A.B.'s "area of difficulty is spelling," (*see* Allison Decl., Ex. 3 at 59.), an issue which is addressed by the encoding goals in the 2019 IEP, (*see id*. at 60–61 (stating that A.B. should aim to "encode a list of decodable words" by the end of each marking period and specifying the nature of those words)).  Though this goal is listed as a "reading" goal in the 2019–2020 IEP, it directly addresses A.B.'s noted writing challenge, spelling.  (*See* Allison Decl., Ex. 1 at 26

(noting that the "encoding" goal could either be considered a reading or a writing goal).)  The IEP was therefore tailored to the issue identified A.B.'s central writing challenge, and the SRO did not err in so concluding.

* * *

In light of the foregoing discussion, the Court denies Plaintiffs' Motion.

###### b.  2020–2021 (Fourth Grade)

Plaintiffs next challenge the SRO's determination that the March 2020 IEP constituted a FAPE.[12]  (*See* Pls. Mem. 16–35.)  Specifically, Plaintiffs argue that the March 2020 IEP's recommendation that A.B. be provided with 90 minutes of direct consultant teacher services in ELA and 40 minutes of small group reading services was inappropriate because, inter alia, it did not provide the "intensive language-based support in all subject areas" that was recommended by the Windward representative.  (*See* Pls. Mem. 16–17.)

The Court finds the SRO's evaluation thorough and well-reasoned and therefore accords it the deference that is required in matters of educational policy.  *W.R. ex rel. N.R. v. Katonah Lewisboro Union Free Sch. Dist.*, No. 21-CV-883, 2022 WL 17539699, at *19 (S.D.N.Y. Dec. 7,

---

[12] Plaintiffs also challenge the CSE's 2020 IEP as failing to specifically note which program it planned to use to address A.B.'s needs, and for failing to adhere to the Wilson Reading System with "fidelity."  (*See* Pls. Mem. 17, 23–24.)  For the reasons discussed above, (*see* supra II.A.C.1.a), these arguments are unavailing.  The District was not required to specify which program it planned to rely on, nor was it required to apply a particular program with "fidelity" to provide a FAPE.  *See T.C.*, 774 F. Supp. 3d at 614–615 (upholding SRO's determination that the IEP was appropriate where parents objected that teacher was not properly certified in the Wilson Reading System because the IEP "did not mandate strict adherence to that methodology"); *A.G.*, 2017 WL 1200906, at *9–10 (rejecting the parents' argument that the district should have been applying the Wilson Reading System with "fidelity" because "there is no requirement that any particular methodology be used"); *accord N.K.M.*, 2024 WL 4803941, at *14 ("'[A] CSE is not required to specify methodology in an IEP,' and '[u]nless a specific methodology is required for a student to receive an educational benefit, the choice of pedagogic methodology is appropriately left to the teacher.'" (quoting *T.C.*, 2016 WL 1261137, at *14)).

2022) (concluding that the SRO's analysis was "thorough and well-reasoned" and therefore affording it "substantial deference"). Moreover, the Court concludes that the impartial hearing record supports the SRO's findings. It is true that at the March 2020 CSE meeting, the District's representatives and the Windward representative disagreed about the amount of intensive instruction that was appropriate for A.B.'s education. (*See* Allison Decl., Ex. 3 at 67 (noting that the Windward liaison expressed that she did not feel A.B. was "ready for anything less supportive than her current program or something comparable").) The District reasoned that the special education that would have been required to give A.B. "intensive language-based support in all subject areas" was "overly restrictive." (*See id*.) At the hearing, the District's Director of Special Services testified that because A.B. had strong social and cognition skills, a placement in intensive special education programming for all subject areas would have been overly restrictive for her needs. (*See* Allison Decl., Ex. 9 at 164.) Furthermore, Windward February 2020 progress report characterized A.B. as performing the required skills in social studies, math, music, and physical education "Consistently" or "Frequently," in contrast to her ELA skills, which she was sometimes noted as performing "Frequently" or "Occasionally."[13] (*See* Allison Decl., Ex. 6 at 37–41.) The Court agrees with the SRO's conclusion that this evidence supports the CSE's conclusion that A.B. did not require "the same level of support in all subjects."[14] (*See*

---

[13] Windward's February 2020 progress report graded students on a five-step scale, based on how frequently the student performed the requisite skills: (1) "Consistently," (2) "Frequently," (3) "Occasionally," (4) "Infrequently," or (5) "Inapplicable." (*See* Allison Decl., Ex. 6 at 37.)

[14] In response, Plaintiffs point to the Windward June 2020 report card, which notes that A.B. would benefit from a "moderate amount of teacher support." (*See* Pls. Mem. 18.) But this report was not part of the record before the CSE at the time that the March 2020 IEP was drafted, (*see* Allison Decl., Ex. 3 at 68), and therefore the SRO did not err in failing to consider it, *see R.E.*, 694 F.3d at 186 (holding that an "IEP must be evaluated prospectively as of the time of its drafting"); *L.S.*, 2024 WL 1859970, at *17 (noting that "[a] substantively appropriate IEP may

Allison Decl., Ex. 1 at 31.)  Because the Court concludes that the SRO's conclusions are supported by the evidence in the record, it will not disturb the SRO's determination that the District provided a FAPE for the 2020–2021 school year.  *See Perez v. Porter*, No. 21-CV-10415, 2025 WL 26071, at *3 (S.D.N.Y. Jan. 3, 2025) (upholding the SRO's conclusion where the determination was supported by the record evidence); *Bd. of Educ. of Wappingers Cent. Sch. Dist. v. M.N. ex rel. J.N.*, No. 16-CV-9448, 2017 WL 4641219, at *10 (S.D.N.Y. Oct. 13, 2017) ("[The SRO's] conclusion is well-reasoned and fully supported by the record, entitling it to deference by this court.").

The Court also rejects Plaintiffs' argument that the SRO improperly considered "retrospective testimony" in concluding that A.B.'s writing needs would be addressed in the Resource Room.  (*See* Pls. Mem. 31.)  In making this determination, the SRO relied upon testimony by A.B.'s special education teacher that a direct consultant teacher was added to A.B.'s IEP for ELA *because* her "writing was slow" and her "spelling was weak," and that A.B. "needed adult assistance to write."  (*See* Allison Decl., Ex. 1 at 30 (citing Allison Decl., Ex. 9 at 380).)  It is no doubt true that "retrospective testimony," cannot justify the appropriateness of an IEP where it "explains a new service not noted [in the IEP]," rather than "further explain[ing] a service provided for in the IEP."  *See L.O.*, 822 F.3d at 115.  This rule "is intended to reflect the fact that 'at the time the parents . . . choose whether to accept the school district recommendation or to place the child elsewhere, they have only the IEP to rely on.'"  *MN ex rel. EN v. Katonah*

_____

not be rendered inadequate through testimony and exhibits that were not before the CSE about subsequent events and evaluations that seek to alter the information available to the CSE"); *C.R. v. N.Y.C. Dep't of Educ.*, 211 F. Supp. 3d 583, 611–12 (S.D.N.Y. 2016) (concluding that an SRO did not "erroneously ignore" testimony about events that had transpired after the drafting of the IEP).

*Lewisboro Sch. Dist.*, No. 19-CV-6793, 2020 WL 7496435, at *18 (S.D.N.Y. Dec. 21, 2020) (alterations adopted) (quoting *R.E.*, 694 F.3d at 186). Nevertheless, the Second Circuit has "reject[ed] a rigid 'four-corners rule'" that would prevent a court from considering evidence explicating the written terms of the IEP." *See R.E.*, 694 F.3d at 195. Hence, "[w]hile testimony that materially alters the written plan is not permitted, testimony may be received that explains or justifies the services listed in the IEP." *Id.*; *see also id.* at 187 ("The appropriate inquiry is into the nature of the program actually offered in the written plan.").

Here, the special education teacher's testimony supplied details about a service that would be provided by the direct consultant teacher—a service that was accounted for in the March 2020 IEP. (*See* Allison Decl., Ex. 3 at 73; Allison Decl., Ex. 9 at 380.) Because this testimony provided further detail about a service listed in the challenged IEP, the Court concludes that it does not implicate the bar on retrospective testimony. *See T.C.*, 774 F. Supp. 3d at 613 (concluding the challenged testimony was not retrospective because it was presented to "explain the nature of [the] IEP"); *S.K. v. City Sch. Dist. of City of New York*, No. 17-CV-6043, 2020 WL 1244473, at *14 (S.D.N.Y. Mar. 13, 2020) (distinguishing between testimony that qualified as "retrospective" because it described "services, resources, or personnel that [the institution] did not have or offer at the time of Plaintiff's placement decision, but could speculatively have obtained if [the student] were to enroll," and "services, resources, and personnel that [the institution] offered at the time [the plaintiff] was making her decision and that [she] would have reasonably known about").

* * *

In sum, the Court rejects Plaintiffs' challenges to the SRO's determination that the District offered A.B. a FAPE for the 2020–2021 school year and agrees with the SRO's reasoning as to the same.

### c. 2021–2022 (Fifth Grade) and 2022–2023 (Sixth Grade)

Finally, Plaintiffs cursorily challenge the SRO's conclusion that both the 2021–2022 and 2022–2023 IEPs provided A.B. with a FAPE. (*See* Pls. Mem. 29–32.) Specifically, Plaintiffs appear to argue that neither IEP provided A.B. with sufficient support for her Disorder of Written Expression. (*See* Pls. Mem. 30–32.) Deference to the administrative decisions below is particularly warranted here, "where the district court's review 'is based entirely on the same evidence as that before the SRO,' and where the IHO and SRO decisions are in agreement." (*See* Def. Opp. 13 (citing *MN*, 2020 WL 7496435, at *10).)

The May 2021 IEP recommended that A.B. receive 45 minutes per day of direct consultant teacher services in ELA, 45 minutes per day of direct consultant teacher services in Math, and 40 minutes per day of Resource Room services. (*See* Allison Decl., Ex. 3 at 90.) The SRO agreed with the IHO that these services were sufficient to provide A.B. with a FAPE for the 2021–2022 school year, and that the hearing record supported the IHO's conclusions. (*See* Allison Decl., Ex. 1 at 33.) This determination is entitled to deference, and a review of the record demonstrates that the May 2021 IEP was appropriately tailored to provide for A.B.'s needs in writing. *See Mason v. Carranza*, No. 20-CV-4010, 2023 WL 6201407, at *11 (E.D.N.Y. Sept. 22, 2023) (concluding, after an independent review of the record, that the SRO's conclusion was supported by a "preponderance of the evidence" and entitled to deference), *reconsideration denied,* No. 20-CV-4010, 2024 WL 3624058 (E.D.N.Y. Aug. 1, 2024), *and appeal withdrawn sub nom. Mason v. Banks*, No. 23-7604, 2024 WL 5673109 (2d Cir. Nov. 7,

2024); *Killoran ex rel. A.K. v. Westhampton Beach Sch. Dist.*, No. 19-CV-3298, 2021 WL

4776720, at *14 (E.D.N.Y. Oct. 11, 2021) (concluding that "[i]n sum, finding the SRO's

decision is supported by a preponderance of the evidence and her determination of an appropriate

school program is the type of educational policy determination to which the Court affords great

deference"), *aff'd sub nom. Killoran v. Westhampton Beach UFSD*, No. 21-2647, 2023 WL

4503151 (2d Cir. July 13, 2023) (summary order).

At the May 2021 CSE meeting, the Windward liaison noted that A.B.'s spelling was

improving, but that she needed direct instruction and visual aids to help her spell correctly.  (*See*

Allison Decl., Ex. 3 at 78.)  The liaison also indicated that with support, A.B.'s writing voice

"shines through" and her "sentences can be very nice."  (*See id*.)  She also noted that the student

could draft a "quick outline" that could be transferred to a paragraph, and that she had recently

written a three-paragraph essay.  (*See id*.)  The liaison also noted that A.B. was a "good self-

advocate with her writing."  (*Id*.)  According to testimony provided by A.B.'s special education

teacher, the daily Resource Room services were to be geared towards A.B.'s writing challenges.

(*See* Allison Decl., Ex. 9 at 387.)  Additionally, the May 2021 IEP also included three writing

goals: using reference materials to check misspelled words, writing a 3-paragraph essay, and

using a graphic organizer to draft the three main components of a paragraph.  (*See* Allison Decl.,

Ex. 3 at 89–90.)  Therefore, the IEP appropriately provided A.B. with direct support in the area

of writing, as well as defined goals that were tailored to the skills that A.B. was seeking to

improve, namely: her spelling abilities and her ability to draft complex passages.[15]

---

[15] Plaintiffs fail to specify which IEP they are challenging from the 2021–2022 school
year.  (*See* Pl. Mem. 30–32.)  To the extent Plaintiffs attempt to challenge the May 2021 IEP as
inadequately addressing A.B.'s Disorder of Written Expression, the Court notes that the results
of the IEE were not available to the CSE at the time the May 2021 IEP was drafted.  (*See* Def.

As for the 2022–2023 school year, the Court also concludes that the services and goals in the 2022 IEP adequately provided for A.B.'s writing needs. The May 2022 IEP allocated a one-hour ICT class in ELA per day, a one-hour ICT class in math per day, 40 minutes in a group resource room with a 3:1 student to instructor ratio, 30 minutes of counseling per week. (*See* Allison Decl., Ex. 3 at 128.) The May 2022 IEP also provided for a number of writing related goals, including that A.B. would make use of reference materials to address proofreading and spelling issues, that she would write a three-paragraph essay that were on topic and utilized

---

56.1 ¶ 36; Pls. Counter 56.1 ¶ 36 (noting that the results of Dr. Dorfman's psychological evaluation were not made available to the CSE until November 2021).) Therefore, the May 2021 IEP could not be rendered inadequate by its failure to account for this information. *See R.E.*, 694 F.3d at 186 (holding that an "IEP must be evaluated prospectively as of the time of its drafting"); *L.S.*, 2024 WL 1859970, at *17 (noting that "[a] substantively appropriate IEP may not be rendered inadequate through testimony and exhibits that were not before the CSE about subsequent events and evaluations that seek to alter the information available to the CSE"); *C.R.*, 211 F. Supp. 3d at 611–612 (S.D.N.Y. 2016) (concluding that an SRO did not "erroneously ignore" testimony about events that had transpired after the drafting of the IEP).

And to the extent Plaintiffs intend to argue that the December 2021 IEP was not appropriate to address A.B.'s Disorder of Written Expression, because it fails to provide "specialized instruction" for A.B.'s disorder, the Court agrees with the SRO and the IHO's conclusions and rejects this challenge. (*See* Allison Decl., Ex. 1 at 34–36.) Dr. Dorfman noted that while A.B. "achieved an average overall score on a test assessing her ability to generate sentences and using appropriate spelling, punctuation, grammar, and capitalization," her performance was "highly inconsistent" because she demonstrated real challenges using appropriate capitalization and grammar when asked to generate her own sentences, and more broadly, that she demonstrated weakness in spontaneous writing. (*See* Allison Decl., Ex. 4 at 141.) Dr. Dorfman also noted that several sentences on her tests "lacked meaningful context" and were "disorganized," and were "notable for a number of spelling errors." (*See id.*)

The CSE considered this evidence. (*See* Allison Decl., Ex. 3 at 99–107.) In response, the December 2021 IEP's writing goals were amended to include goals aimed at ensuring that A.B. would use correct capitalization and punctuation in her writing. (*See id.* at 109.) The CSE also decreased the teacher-to-student ratio in the Resource Room from 1:5 to 1:3, added assistive technology, and increased A.B.'s testing time accommodations. (*See id.* at 110–111.) The December 2021 IEP therefore provided A.B. with more focused instruction opportunity; maintained goals related to spontaneous writing, organization, and spelling; and added goals that reflected the challenges that A.B. demonstrated with capitalization and grammar in her IEE. These changes were appropriate to address A.B.'s demonstrated needs.

transition words, that she would use a graphic organizer to complete a writing task, and she would use the correct punctuation. (*See id*. at 127.) These services and goals appear tailored to A.B.'s needs, which included: spelling; generating stories, especially under conditions that were less spontaneous; and organizing her ideas. (*See* Allison Decl., Ex. 3 at 123–124.) Moreover, A.B.'s 2021–2022 Progress report noted that she was "Approaching Proficiency" in all categories of writing, though her teacher noted that proofreading was "still an area of difficulty for her." (*See* Allison Decl., Ex. 6 at 50.) And A.B.'s testing indicated she was in the average range for most writing skills. (*See* Allison Decl., Ex. 3 at 123–124.) The IEP therefore provided goals tailored to her largest areas of weakness in writing: proofreading and spelling, as well as organization. Accordingly, the Court concludes that the record supports the SRO and IHO's determinations by a preponderance of the evidence, and that they are entitled to deference. *See Mason*, 2023 WL 6201407, at *11 (concluding, after an independent review of the record, that the SRO's conclusion was supported by a "preponderance of the evidence" and entitled to deference); *Killoran*, 2021 WL 4776720, at *14 (concluding that "[i]n sum, finding the SRO's decision is supported by a preponderance of the evidence and her determination of an appropriate school program is the type of educational policy determination to which the Court affords great deference.").

* * *

For the foregoing reasons, the Court concludes that the May 2021 and May 2022 IEPs provided a FAPE for the 2021–2022 and 2022–2023 school years.

### 2. Unaddressed Challenges to the IEPs

Plaintiffs also raise a number of other challenges: (1) a "Child Find" challenge, (2) a challenge arguing that the District impeded parental input and insufficient disclosure of their

rights and options, and (3) a challenge to the "misuse" of academic intervention services

("AIS").  (*See* Pls. Mem. 36; Allison Decl., Ex. 2 at 22–24.)  Plaintiffs argue that these

challenges were not addressed by the IHO in its initial decision, and therefore that they should be

remanded for further proceedings.  (*See* Pl. Mem. 36.)  Defendant points out that these claims

were first raised in the Plaintiffs' post-hearing briefs and therefore argues that they were waived.

(*See* Def. Opp. 17–18.)  Alternatively, Defendant argues that because Plaintiffs failed to raise

these issues on appeal to the SRO, they were waived.  (*See id*. at 17.)

      In general, "parents must state all of the alleged deficiencies in the IEP in their initial due

process complaint."  *R.E.*, 694 F.3d at 187 n.4; *see also Rivas v. Banks*, No. 22-CV-10007, 2023

WL 8188069, at \*10 (S.D.N.Y. Nov. 27, 2023) ("By statute, a parent 'requesting [a] due process

hearing shall not be allowed to raise issues at the due process hearing that were not raised in the

[DPC], unless the other party agrees otherwise.'" (alterations in original) (quoting 20 U.S.C.

§ 1415(f)(3)(B)), *reconsideration denied*, No. 22-CV-10007, 2024 WL 292276 (S.D.N.Y. Jan.

25, 2024), and *aff'd sub nom. Rivas v. Ramos*, No. 24-268, 2024 WL 5244849 (2d Cir. Dec. 30,

2024) (summary order).  Nevertheless, the Second Circuit has made clear that, the IDEA's

"waiver rule is not to be mechanically applied."  *C.F. ex rel. R.F. v. N.Y.C. Dep't of Educ.*, 746

F.3d 68, 78 (2d Cir. 2014).[16]  Courts have deemed a challenge preserved for judicial review

under circumstances where: "(1) the [d]ue [p]rocess [c]omplaint provides fair notice to the

---

[16] Although the term "waiver" typically applies to a litigant's "intentional relinquishment
of a known right," while forfeiture usually applies to "action or inaction" by a litigant that "is
deemed to incur the consequence of loss of a right[] or . . . a defense," *see Doe v. Trump Corp.*, 6
F.4th 400, 409 n.6 (2d Cir. 2021) (citation omitted), case law in the IDEA context uses the term
"waiver" to refer to the omission of asserted IEP issues in the initial due process complaint, *see,
e.g.*, *Rivas v. Ramos*, No. 24-268, 2024 WL 5244849, at \*1 n.1 (2d Cir. Dec. 30, 2024)
(summary order). The Court therefore applies that term here.

[school district] of the argument at issue; (2) both the IHO and SRO reach the issue on the

merits, giving the federal court a record for review; or (3) the argument goes to the heart of [the]

dispute." *Rivas*, 2023 WL 8188069, at \*10 (alterations in original) (quoting *Davis v. Carranza*,

No. 19-CV-10123, 2021 WL 964820, at \*6 (S.D.N.Y. Mar. 15, 2021)); *but see Rivas v. Ramos*,

No. 24-268, 2024 WL 5244849, at \*1 (2d Cir. Dec. 30, 2024) (summary order) ("While we have

said that the IDEA's waiver rule is not to be mechanically applied, that is true only when an

alleged deficiency is not completely absent from the due process complaint." (internal citation

omitted)); *B.P. v. N.Y.C. Dep't of Educ.*, 634 F. App'x 845, 850 (2d Cir. 2015) (summary order)

(holding that "the issue deemed waived" cannot be "[un]encompassed . . . by specific

allegations" and "completely absent from the due process complaint").[17]

        In their post-hearing brief, Plaintiffs argued that Defendant failed to satisfy its so-called

"child find" obligation.  (*See* Allison Decl., Ex. 2 at 22.)  Under this provision of the IDEA,

states "have an obligation . . . to identify, locate, and evaluate '[a]ll children with disabilities

residing in the State' to determine whether they require special education and related services."

*J.D. v. Rye Neck Union Free Sch. Dist.*, No. 22-CV-3039, 2023 WL 1797170, at \*1 (S.D.N.Y.

Feb. 7, 2023) (quoting 20 U.S.C. § 1412(a)(3)(A)).  Plaintiffs argued that the District failed to

---

        [17] The Court cites these summary orders as persuasive, rather than precedential,
authority.  *See Bldg. & Realty Inst. of Westchester & Putnam Ctys., Inc. v. New York*, No. 19-
CV-11285, 2021 WL 4198332, at \*19 n.22 (S.D.N.Y. Sept. 14, 2021) ("While summary orders
do not have precedential effect, the Court is not at liberty to disregard or contradict 'a Second
Circuit ruling squarely on point merely because it was rendered in a summary order' and rather
should view such reasoning as '*valuable appellate guidance*.'" (emphasis added) (quoting *United
States v. Tejada*, 824 F. Supp. 2d 473, 475 (S.D.N.Y. 2010)), *aff'd*, No. 21-2448, 2024 WL
1061142 (2d Cir. Mar. 12, 2024) (summary order); *Arace v. Thompson*, No. 08-CV-7905, 2011
WL 3627716, at \*3 (S.D.N.Y. Aug. 17, 2011) ("While *Federman* is only a summary order, and
thus, according to the Second Circuit rules, lacking in precedential value, it is persuasive
authority.").

fulfill to this obligation where it failed to investigate A.B.'s reading deficits for two years before providing her with any kind of special education services.[18]  While it is true that this challenge was not formally raised in the Amended Due Process Complaint, the Complaint is replete with relevant allegations.  (*See, e.g.,* Allison Decl., Ex. 1 at 228–231 (discussing A.B.'s "clear struggle and lack of progress" in the years prior to her first IEP, as well as repeated calls made by Plaintiffs to A.B.'s classroom teachers "to see if they could better ascertain what was going on").)  The issue was also raised at the impartial hearing.  (*See* Allison Decl., Ex. 9 at 674–688.)  The Court therefore concludes that the District was sufficiently on notice of this challenge, such that its consideration would not constitute "sandbagging."[19]  *See C.F.,* 746 F.3d at 78

_____

[18] Plaintiffs also appear to argue that the District improperly provided Academic Intervention Services ("AIS") where it should have provided special education services.  (*See* Allison Decl., Ex. 2 at 24).  The Court concludes that this claim substantially overlaps with Plaintiffs' "child find" claim and therefore considers them together.

[19] Further, the Court rejects Defendant's argument that Plaintiffs failed to preserve this issue because they did not raise it in their cross-appeal to the SRO.  (*See* Def. Opp. 17.)  "Federal and state law require parties in IDEA proceedings to appeal only to the extent that they are 'aggrieved' by all or a portion of an IHO's decision."  *D.B. v. N.Y.C. Dep't of Educ.*, 966 F. Supp. 2d 315, 328 (S.D.N.Y. 2013) (citing 20 U.S.C. § 1415(g)(1) and 8 N.Y.C.R.R. § 200.5(k)(1)); *see also Phillips v. Aviles-Ramos*, No. 23-CV-2140, 2025 WL 1547490, at *2 (S.D.N.Y. May 29, 2025) ("The IDEA's administrative exhaustion requirement applies differently depending on whether a party was aggrieved by the [IHO's determination].").  Because the IHO did not reach the Parents' claim as to the "child find" claim, (*see* Allison Decl., Ex. 1 at 51 n.9), Plaintiffs were not "aggrieved," and therefore did not fail to preserve this claim, *see G.S. v. Pleasantville Union Free Sch. Dist.*, No. 19-CV-6508, 2020 WL 4586895, at *16 (S.D.N.Y. Aug. 10, 2020) ("Plaintiffs were not aggrieved by the IHO's decision to not address certain issues raised in the DPC."); *NB & CB v. N.Y.C. Dep't of Educ.*, No. 15-CV-4948, 2016 WL 5816925, at *4 (S.D.N.Y. Sept. 29, 2016) ("The DOE is correct that because the IHO did not address the allergy claims, the DOE was not required to cross-appeal on those claims to the SRO."), *aff'd sub nom. N.B. v. N.Y.C. Dep't of Educ.*, 711 F. App'x 29 (2d Cir. 2017) (summary order); *W.W. v. N.Y.C. Dep't of Educ.*, No. 12-CV-7196, 2014 WL 1330113, at *15 (S.D.N.Y. Mar. 31, 2014) ("The Court agrees that [the plaintiff] was not obligated to cross-appeal the IHO's decision because she was not aggrieved by it."); *T.G. ex rel. R.P. v. N.Y.C. Dep't of Educ.*, 973 F. Supp. 2d 320, 337–38 (S.D.N.Y. 2013) ("Most judges in this district have concluded that when an IHO rules in favor of a parent on some grounds, but fails to reach other grounds alleged in the parent's due process complaint, the parent's failure to cross-appeal those issues to the SRO

(concluding an issue was not waived where the issue was referenced in the complaint and raised in the impartial hearing); *J.W. v. N.Y.C. Dep't of Educ.*, 95 F. Supp. 3d 592, 603 (S.D.N.Y. 2015) (concluding that an issue was not waived where statements in the due process complaint put the defendant on notice).

However, because neither the IHO nor the SRO considered the merits of this issue in their opinions, the Court will remand to the SRO to address the merits of the argument. *See N.K.M.*, 2024 WL 4803941, at *16 ("[B]ecause this matter would benefit from the application of educational expertise, the Court remands this matter to the SRO for consideration in the first instance."); *W.A. v. Hendrick Hudson Cent. Sch. Dist.*, No. 14-CV-3067, 2017 WL 3066888, at *9 (S.D.N.Y. July 18, 2017) ("[R]emand is appropriate where the district court has received insufficient guidance from state administrative agencies as to the merits of a case, or where proper resolution of the disputed issue requires expertise." (citation omitted)) (collecting cases), *aff'd*, 927 F.3d 126 (2d Cir. 2019).

Finally, Plaintiffs attempt to repackage their substantive claims as procedural ones by arguing that the District "significantly impeded the parents' opportunity to participate in the decision-making process" by: failing to inform them of the "Special Classes" available on the New York State continuum of services; ignoring requests for quantitative present-levels information; failing to consider seriously the parents' plea for individualized reading and writing instruction; ignoring the recommendations from the 2021 IEE and in-meeting participation of Dr. Dorfman; and failing to provide Parents with an IEP that provided Plaintiffs with "sufficient

---

does not result in their waiver.") (collecting cases); *FB*, 923 F. Supp. 2d at 588 ("Parents' failure to cross-appeal an issue not addressed by the IHO one way or the other does not and should not prevent that issue from being preserved for review by the SRO.").

information" for them to make an informed decision about services being offered to the student. (*See* Allison Decl., Ex. 2 at 22–23.) These allegations largely repeat Plaintiffs' substantive claims: that the District failed to provide them with detailed information about the instruction it planned to offer A.B., (*see* Pl. Mem. 13, 18, 30–31); that the District should have provided more intensive reading and writing instruction, (*see* Pl. Mem. 12, 16–18, 23–24); and that the District should have abided by the recommendations made by privately-obtained specialists, (*see* Pl. Mem. 30–31). The Court has addressed each of these claims above, (*see* supra II.C.1.), and therefore declines to remand them to the SRO, *see E.L. v. Bedford Cent. Sch. Dist.,* No. 18-CV-3062, 2022 WL 3667189, at *18 (S.D.N.Y. Aug. 25, 2022) (rejecting substantive challenges that "echo[ed the] procedural challenges of [the] IEP," where the court had already dismissed the procedural challenges); *J.F. v. Shirvell*, No. 11-CV-900, 2012 WL 3560911, at *5 (D. Conn. Aug. 6, 2012) (rejecting alleged procedural deficiencies in the provision of the IEP as "really substantive claims in disguise" where "[t]here [was] no allegation [] that parents were denied the chance to attend meetings, that records were not shared, or that an independent evaluation was not provided").

* * *

For the foregoing reasons, the Court remands the question of whether the District violated its "child find" obligations to the SRO and dismisses Plaintiffs' other claims.

### III.    Conclusion

For the foregoing reasons, Plaintiffs' Motion is denied insofar as it raises substantive challenges to the 2019, 2020, 2021, and 2022 IEPs. The Court remands Plaintiffs' child find challenge to the SRO. Defendant's Motion is granted except as to the remanded child find claim.

The Clerk of Court is respectfully directed to terminate the pending motion, (Dkt. No. 28) and close the case for administrative purposes only.[20]

SO ORDERED.

Dated:    September 25, 2025
          White Plains, New York

_____
KENNETH M. KARAS
United States District Judge

---

[20] Should there be another appeal, the appealing party should request by letter that the Court re-open the case.

44